United States Court of Appeals
Fifth Circuit

**F I L E D**

February 10, 2004

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

No. 03-40650

VALMONT ENERGY STEEL, INC. and VALMONT MICROFLECT, INC.,

Plaintiffs-Appellees,

versus

COMMERCIAL UNION INSURANCE CO. and CU LLOYD'S OF TEXAS,

Defendants-Appellants.

Appeal from the United States District Court
For the Eastern District of Texas, Lufkin

Before JOLLY, HIGGINBOTHAM, and DeMOSS, Circuit Judges.

DeMOSS, Circuit Judge:

Defendants-Appellants Commercial Union Insurance Co. ("Commercial") and CU Lloyd's of Texas ("CU Lloyd's") (collectively, "Appellants") seek reversal of the district court's decision to enforce a judgment obtained by Plaintiffs-Appellees Valmont Energy Steel, Inc. and Valmont Microflect, Inc. (collectively, "Valmont") against Continental Manufacturing, Inc. ("Continental"), a company insured by Appellants. The district court concluded that Appellants' insurance policies covered the injury suffered by Valmont and enforced the judgment. Appellants

raise three points of error: that there was no "occurrence" within the meaning of the insurance policies; that there was no "property damage" within the meaning of the policies; and that the "your product" exclusion in Appellants' policies with Continental plainly excluded coverage. Here, because we find the "your product" exclusion unambiguous, we need not address the questions of whether there was "property damage" and an "occurrence" within the meaning of Appellants' policies. We find the "your product" exclusion clearly barred coverage of the damages suffered by Valmont. We thus REVERSE the decision of the district court and RENDER judgment in favor of Appellants.

## BACKGROUND

The pertinent underlying facts are as follows: Valmont entered into a contract with Continental for the purchase of steel flanges for use in Valmont's construction of microwave towers. Under the terms of the contract, the steel flanges were required to have a 50,000-pound yield and tensile strength. With each shipment of flanges, Continental agreed to include either a Material Test Report ("MTR") that verified the grade and quality of the steel used in the production of the flanges or a certification that Continental had the original MTR verifying the steel specifications on file in their Nacogdoches, Texas, offices. Continental represented to Valmont that it had an MTR on file confirming that each steel flange satisfied Valmont's quality specifications.

2

Continental shipped the flanges to Valmont, which used some flanges in the construction of a microwave tower.

A Valmont customer service representative later noticed inconsistencies in the paperwork submitted by Continental, and Valmont requested that Continental supply the MTRs. Valmont then reviewed the MTRs and contacted the steel manufacturer listed, U.S. Steel Corp. ("U.S. Steel"). U.S. Steel responded that the MTRs had been substantially altered and that it could not verify to Valmont the origin of the steel used in the flanges or the steel's strength. Valmont subsequently submitted six of the flanges to an independent tester to determine their tensile strength. In order to test the flanges, each had to be destroyed; all six flanges failed to meet the contract specifications.

In November 1998 Valmont filed a breach of contract suit against Continental in district court relying upon diversity of citizenship for jurisdiction. A bench trial was held in November 1999. In its findings of fact and conclusions of law, the district court in such prior suit concluded that Continental had supplied false information because the steel used in the flanges was not of the quality specified; Continental had not maintained the original certifications on file; Continental had not exercised reasonable care in providing the certifications; and the flanges were unusable by Valmont because they could not be tested without destroying them. On February 2, 2000, the district court in such prior suit found Continental liable to Valmont for negligent misrepresentation

3

and awarded Valmont its "out of pocket" expenses, meaning the difference between the purchase price of the flanges and the value received, plus pecuniary loss – a total of $118,519.47.

Appellants had provided Continental with two commercial insurance policies: a general liability policy and an umbrella policy. Under the general policy, CU Lloyd's agreed to "pay those sums that the insured becomes legally obligated to pay as damages because of . . . 'property damage' to which the insurance applies." The general policy defined "property damage" either as "[p]hysical injury to tangible property, including all resulting loss of use of that property," or as "[l]oss of use of tangible property that is not physically injured." Property damage was covered by the general policy only if it was "caused by an 'occurrence.'" The general policy defined "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Like the general policy, the umbrella policy issued by Commercial applied to "property damage" caused by an "occurrence." The umbrella policy thus provided similar coverage on an excess basis.

The general policy contained an exclusion that stated no coverage was provided for "'[p]roperty damage' to 'your product' arising out of it or any part of it." The term "your product" was defined in the general policy as "[a]ny goods or products . . . manufactured, sold, handled, distributed or disposed of by" the insured. That definition of "your product" expressly included

4

"[w]arranties or representations made at any time with respect to the fitness, quality, durability, performance or use of 'your product.'" The umbrella policy also contained an identical "your product" exclusion and similarly defined "your product."

After judgment for Valmont was entered in the prior suit, Continental filed for bankruptcy and Appellants refused to indemnify Continental because the damages caused by Continental were outside the scope of the policies. On February 23, 2001, Valmont filed the present diversity suit as judgment creditor against Appellants in district court, alleging Appellants were liable to pay Valmont's damages under the terms of their policies with Continental. On October 3, 2001, Appellants moved for summary judgment, arguing first, that Continental's negligent misrepresentations did not cause "property damage" because Valmont was awarded only economic damages in the underlying suit; second, that negligent misrepresentation did not constitute an "occurrence" within the meaning of the policies; and third, that the "your product" exclusion barred any coverage.

The district court disagreed and denied Appellants' motion on September 30, 2002. The court found "property damage" because the flanges were rendered unusable by Continental's carelessness. Under the plain terms of the policies, the loss of use of the flanges constituted "property damage." Pursuant to case law, the court further held that Continental's negligent misrepresentations constituted an "occurrence." Lastly, the district court concluded

5

that the "your product" exclusion did not bar coverage here because the exclusion conflicted with the "products-completed operations hazard" definition and the "Products-Completed Operations Aggregate Limit" in the policies – which appeared to provide coverage. Given the conflict, the district court concluded the "your product" exclusion was ambiguous and allowed coverage. Valmont then moved for summary judgment on January 31, 2003. The district court relied on its findings from its order denying Appellants' motion for summary judgment and granted Valmont's motion for summary judgment on March 31, 2003. Appellants timely appealed.

## DISCUSSION

We review a district court's summary judgment rulings *de novo*, and apply the same standard as the district court. **Travelers Cas. & Sur. Co. of Am. v. Baptist Health Sys.**, 313 F.3d 295, 297 (5th Cir. 2002) (citing **Potomac Ins. Co. v. Jayhawk Med. Acceptance Corp.**, 198 F.3d 548, 550 (5th Cir. 2000)). Under Fed. R. Civ. P. 56(c), district courts properly grant summary judgment if, viewing the facts in the light most favorable to the nonmovant, the movant shows there is no genuine issue of material fact such that the movant is entitled to judgment as a matter of law. *Id.; see also* **Anderson v. Liberty Lobby, Inc.**, 477 U.S. 242, 251-52 (1986). The district court's interpretation of an insurance contract is a question of law also subject to *de novo* review. **Canutillo Indep. Sch. Dist. v. Nat'l Union Fire Ins. Co.**, 99 F.3d 695, 700 (5th Cir.

6

1996) (applying Texas law) (citations omitted). Both parties agree that the policies should be interpreted under Texas law. In Texas, courts employ general rules of contract construction to insurance policies. *Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738, 740-41 (Tex. 1998). The terms of an insurance policy are unambiguous as a matter of law if they can be given definite or certain legal meaning. *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995) (citing *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983)). The policy must be considered as a whole, and each part given effect and meaning. *Canutillo*, 99 F.3d at 700 (citation omitted). If the court finds no ambiguity, the court's duty is to enforce the policy according to its plain meaning. *Puckett v. United States Fire Ins. Co.*, 678 S.W.2d 936, 938 (Tex. 1984) (citation omitted). "The fact that the parties disagree as to coverage does not create an ambiguity, nor may extrinsic evidence be admitted for the purpose of creating an ambiguity." *Sharp v. State Farm Fire & Cas. Ins. Co.*, 115 F.3d 1258, 1261 (5th Cir. 1997) (applying Texas law); *see also CBI Indus.*, 907 S.W.2d at 520.

The Texas Supreme Court has found that "[i]f, however, the language of a policy or contract is subject to two or more reasonable interpretations, it is ambiguous." *CBI Indus.*, 907 S.W.2d at 520. Courts can only consider the parties' interpretation of a contract if the court first determines a

7

contract to be ambiguous. *Id.* (citing *Sun Oil Co. (Delaware) v. Madeley*, 626 S.W.2d 726, 732 (Tex. 1981)). If the court finds an ambiguity in the contract provisions, particularly in an exclusion clause, the court should construe the policy strictly against the insurer. *Bailey*, 133 F.3d at 369; *Balandran*, 972 S.W.2d at 741 (noting that, where an ambiguity is found, courts should adopt the insured's interpretation as long as it is reasonable, even where the insurer's interpretation is a more reasonable interpretation).

**Whether the district court erred in finding that the "your product" exclusion in the insurance policies was ambiguous and unenforceable.**

Appellants argue that any "property damage" to the flanges purchased by Valmont clearly falls within the policies' unambiguous "your product" exclusion, which clause bars coverage of those damages. Again, both the general and umbrella policies contained a "your product" exclusion – located in subsections k and h, respectively, of "Exclusions" under "Section I-Coverages" – that expressly stated no coverage was provided for "'property damage' to 'your product' arising out of it or any part of it." The term "your product" was defined in both policies as "[a]ny goods or products . . . manufactured, sold, handled, distributed or disposed of by" the insured. The definition of "your product" in the general policy expressly included "[w]arranties or representations made at any time with respect to the fitness, quality, durability, performance or use of 'your product'"; and the umbrella policy

8

similarly defined "your product" to include "warranties or representations" made by Continental about its products. Thus, Appellants assert that any physical damage to the flanges sold by Continental to Valmont and any loss of the use of the flanges was "property damage" to the insured Continental's "product" arising out of the insured Continental's "product" – Continental's representations with respect to the quality of its flanges. Appellants argue that the district court's refusal to enforce the "your product" exclusion as ambiguous constitutes legal error.

Under Texas law, Appellants bear the burden of establishing that a policy exclusion constitutes an avoidance of or affirmative defense to coverage. Tex. Ins. Code Ann. art. 21.58(b) (Vernon Supp. 2004); *see also* ***Performance Autoplex II Ltd. v. Mid-Continent Cas. Co.***, 322 F.3d 847, 854 (5th Cir. 2003). The district court did not dispute and Valmont does not appear to dispute that, when viewed in isolation, the "your product" exclusion appeared to bar coverage of the damage to the flanges at issue in this case. However, the district court refused to apply the "your product" exclusion because it determined that other provisions in the policies – the provisions relating to "products-completed operations hazard" – appeared to grant coverage and thus rendered the "your product" exclusion ambiguous. Valmont contends that the district court's interpretation of the "your product" exclusion as ambiguous is correct.

9

Both policies define "products-completed operations hazard" in their respective "Section V-Definitions" to include: "all . . . 'property damage' occurring away from premises you own or rent and arising out of 'your product' . . . except . . . [p]roducts that are still in your physical possession." In the general policy, "Section III-Limits of Insurance" lays out certain limits of the provided "property damage" coverage:

2. The General Aggregate Limit is the most we will pay for the sum of:
. . .
   b. Damages under Coverage A, except damages because of . . . "property damage" included in the "products-completed operations hazard";
. . .
3. The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage A for damages because of . . . "property damage" included in the "products-completed operations hazard."

Coverage A of "Section I-Coverages" of the general policy provided for "property damage liability." The umbrella policy contained similar provisions laying out that policy's "General Aggregate Limit" and "Products-Completed Operations Aggregate Limit," also located in its "Section III-Limits of Insurance."

Valmont urges that the definition of "products-completed operations hazard" conflicted with the "your product" exclusion. While the "your product" exclusion removed coverage for "property damage" to Continental's "product" arising from its "product," the plain language of the "products-completed operations hazard" appeared to extend coverage to "property damage" arising out of

10

Continental's "product," as long as the damage occurred off Continental's premises and not while Continental still had physical possession of its "product." The district court was persuaded by this argument, concluding that the "your product" exclusion and "products-completed operations hazard" definition, when read together with the "Products-Completed Operations Aggregate Limit" and in the context of each entire policy, potentially created an ambiguity in the scope of coverage. The court worried that if it applied the "your product" exclusion, then the "products-completed operations hazard" definition and the "Products-Completed Operations Aggregate Limit" would have an uncertain meaning; accordingly, the court determined that the ambiguity should be construed in favor of coverage such that the "your product" exclusion was not enforceable.

After considering the "your product" exclusion, the "products-completed operations hazard" definition, and the "Products-Completed Operations Aggregate Limit" within the context of each policy as a whole, we conclude that the district court erred when it determined there was a conflict among the provisions. Both policies clearly included the "your product" exclusion under the subsection "Exclusions" in their respective "Section I-Coverages." Thus, "Section I-Coverages" is where coverage is both granted as to damages because of "property damages" caused by an "occurrence," and then limited by exclusions such as the "your product" exclusion. Clearly, "Section V-Definitions" is where terms such as

11

"property damage," "your product," and "products-completed operations hazard" used in each policy are defined. However, the district court incorrectly assumed that the "Products-Completed Operations Aggregate Limit" in "Section III-Limits of Insurance" of each policy also functioned to grant coverage. What "Section III-Limits of Insurance" did instead is simply explain the amount of damages each policy will cover – read together with the definition of "products-completed operations hazard," it delineated the declared limits of the insurance for off-premises "property damage" arising from Continental's product. The two Section III provisions cited above – the "General Aggregate Limit" and the "Products-Completed Operations Aggregate Limit" – thus divided the amount of coverage offered under each policy into two components, each of which contained its own coverage limitation. The General Aggregate Limit for each policy provided coverage of up to $2,000,000 for all "property damage" except damage occurring away from Continental's premises arising from Continental's product – "products-completed operations hazard." Damage that occurred away from Continental's premises arising from Continental's product – "products-completed operations hazard" – had its own declared "Products-Completed Operations Aggregate Limit," also of $2,000,000 for each policy.

Therefore, because the "Products-Completed Operations Aggregate Limit" provision did not separately grant "products-completed operations hazard" coverage, there is no discord with the "your product" exclusion. The three clauses can easily be read

12

together without conflict. Under Section I, Appellants were obligated to indemnify Continental for all damages because of "property damage" caused by an "occurrence" that Continental became legally obligated to pay, except for "property damage" to Continental's own "product" arising from its own "product." Included in this overall "property damage" coverage is coverage for "products-completed operations hazard"; that is, Appellants were required to indemnify Continental for all damages because of "property damage" caused by an "occurrence" occurring away from Continental's premises and arising out of its "products," but not for damages because of "property damage" to Continental's "products" themselves. The "your product" exclusion thus works together cleanly with the definition of "products-completed operations hazard."

Put simply: for each policy, Section I grants broad coverage of damages due to "property damage"; the Section I "your product" exclusion limits that coverage; and Section III sets out limits on the amount of coverage Appellants will pay, depending on the location of the damage. Because we find that the "your product" exclusion is susceptible to only one reasonable interpretation and can be given definite meaning within each policy as a whole, such exclusion is unambiguous as a matter of law. Therefore, our duty is to enforce the policy according to its plain meaning. Presupposing that the sums Continental became legally obligated to pay to Valmont as damages for negligent misrepresentation were

13

because of "property damage" caused by an "occurrence," a plain reading of "your product" exclusions k and h, respectively, of the general and umbrella policies clearly bars coverage of the "property damage" to Continental's "product" (the steel flanges sold to Valmont) arising from Continental's "representations" made with respect to the "quality" of Continental's "product," regardless of the location where such "property damage" occurred. Thus, Appellants are not obligated to indemnify Continental.[1]

## CONCLUSION

Having carefully reviewed the record of this case and the parties' respective briefing and for the reasons set forth above, we conclude that the district court erred in denying summary judgment to Appellants and in granting summary judgment to Valmont. Therefore, we **REVERSE** the decision of the district court below and **RENDER** judgment on behalf of Appellants.

**REVERSED and RENDERED.**

---

[1] We note that because of the amount of the damages at issue here ($118,519.47), only the general policy issued by CU Lloyd's would have provided any applicable coverage to Continental to pay damages to Valmont, not the excess umbrella policy issued by Commercial. However, as both CU Lloyd's and Commercial were sued by Valmont and both here appeal the district court's decision, we considered the application of the "your product" exclusion found in both policies.

14