# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 3, 2008

Charles R. Fulbruge III
Clerk

No. 07-20468

COOPER INDUSTRIES LLC; COOPER B-LINE INC

Plaintiffs - Appellants

v.

AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE CO

Defendant - Appellee

Appeal from the United States District Court
for the Southern District of Texas, Houston
USDC No. 4:06-CV-1082

Before KING, STEWART, and PRADO, Circuit Judges.

PER CURIAM:[*]

This is an insurance coverage dispute stemming from the settlement of a wrongful death case filed against plaintiff-appellant Cooper Industries, LLC and its wholly-owned subsidiary, plaintiff-appellant Cooper B-Line, Inc. The district court granted summary judgment to the insurer, American International Specialty Lines Insurance Company. Plaintiffs-appellants appeal, arguing that the district court erred by denying Cooper Industries, LLC coverage under its employer's liability policy, and, in the alternative, by failing to allocate the

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

settlement between the covered and uncovered claims. We affirm the district court's holding with respect to coverage under the employer's liability policy, but we vacate the district court's judgment and remand for determination of the allocation of liability.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In October 2004, two employees of Cooper B-Line, Inc. ("B-Line") were killed in the course and scope of their employment at a B-Line plant in Texas. Subsequently, representatives of the two decedents sued B-Line and its parent corporation, Cooper Industries, LLC ("Cooper"), asserting various negligence and gross negligence claims against both entities (the "underlying suit"). Cooper and B-Line timely submitted the claims of the underlying suit to their employer's liability insurer and excess liability insurer.[1] Cooper and its subsidiaries, including B-Line, carried primary employer's liability insurance from ACE American Insurance Company ("ACE") at the time of the underlying suit. The ACE employer's liability policy provided the "insured" with a $1 million primary coverage limit and a $1 million deductible. As such, it was merely a fronting policy, and the $1 million deductible was considered a self-insured retention.

During the relevant time period, Cooper Industries, Ltd. ("CBE"), the parent corporation of Cooper,[2] carried comprehensive excess liability coverage from defendant-appellee American International Speciality Lines Insurance Company ("AISLIC"). The AISLIC policy, issued to CBE, covered CBE and over one hundred worldwide subsidiaries, including Cooper and B-Line, and had an aggregate limit of $25 million. Significantly, the AISLIC policy provided excess coverage to: (1) the $1 million ACE employer's liability policy; and (2) a $5

---

[1] The policies at issue covered Cooper Industries, Inc., but this case was brought by its successor in interest, Cooper Industries, LLC.

[2] CBE is a publicly-traded company engaged in manufacturing, marketing, and sales of electrical products and tools.

million self-insured retention for general commercial liability ("GCL") coverage. Thus, Cooper maintained employer's liability coverage from the ACE primary policy with a $1 million deductible and the AISLIC excess policy, and it maintained GCL coverage from the AISLIC excess policy (over and above a self-insured retention of $5 million).

On August 19, 2005, AISLIC informed Cooper and B-Line that the claims asserted in the underlying suit must be bifurcated relative to each entity's primary insurance coverage. Specifically, AISLIC admitted that the claims asserted against B-Line in the underlying suit are covered by the ACE employer's liability policy because B-Line was the employer of the decedents. Thus, after satisfaction of the $1 million deductible, B-Line would be entitled to indemnification from AISLIC for any excess employer's liability. However, according to AISLIC, the claims asserted against Cooper in the underlying suit fall under Cooper's GCL policy, not the ACE employer's policy. As such, AISLIC took the position that Cooper must satisfy its $5 million self-insured retention for GCL claims to trigger coverage under the AISLIC excess liability policy.

The underlying suit was settled for an amount which is confidential. Cooper and B-Line paid the $1 million agreed upon deductible under the ACE employer's policy. AISLIC then paid $2.6 million, the additional amount it attributed to B-Line's liability. To finalize the settlement, Cooper and AISLIC each agreed to pay half of the remaining amount, $1.35 million—the amount that AISLIC attributed to Cooper as GCL. However, each party funded this portion of the settlement with a reservation of its right to recover in later proceedings.

On March 30, 2006, Cooper and B-Line brought a breach of contract suit against AISLIC, arguing that they are jointly covered as a single collective insured under the ACE employer's policy and seeking $683,250—fifty percent of the $1.35 million and ad litem fees that the entities paid in settlement of the

underlying suit. On July 24, 2006, AISLIC counterclaimed for a declaratory judgment that Cooper's liability in the underlying suit is not covered by the ACE employer's policy and for reimbursement of its payment of $683,250. Subsequently, the parties filed cross motions for summary judgment.

On May 31, 2007, the district court granted AISLIC's motion for summary judgment after determining that the ACE employer's policy is not susceptible to Cooper's single collective insured interpretation. Specifically, the district court reasoned that in order to find that the word "employer" referred to more than one entity, as Cooper urged, "employer" must be a collective noun. Since "employer" is customarily considered a singular noun when standing alone, see DICTIONARY OF COLLECTIVE NOUNS AND GROUP TERMS 75–76, 233 (2d ed. 1985) (a compendium of more than 1,800 collective nouns, group terms, and phrases that includes the word employee but not employer), the district court concluded that it is unreasonable to construe it as a collective noun here. Then, relying on the legal definition of employer, the district court stated that "the plain meaning of the word employer—'one [entity that] pays the worker's salary or wages'—supports AISLIC's position that only B-Line, the entity that paid the decedent's salary,[3] is the 'employer named in [I]tem 1' of the ACE employer liability policy."[4] Because the policy refers to coverage of employees employed by an employer,[5] the district court determined that "the policy provides coverage

---

[3] See BLACK'S LAW DICTIONARY 565 (8th ed. 2004) (providing that the definition of employer is "a person who controls and directs a worker under an express or implied contract of hire and who pays the worker's salary or wages").

[4] The General Section of the ACE policy states that the policy "is a contract of insurance between you (the employer named in Item 1 of the Information Page) and us (the insurer named on the Information Page)." (Emphasis added).

[5] The relevant coverage provisions state:

PART TWO - EMPLOYERS LIABILITY INSURANCE

A.      How This Insurance Applies

4

only to the employer who paid the wages of the employee, not other entities covered under the policy who have their own employees." Since "the parties agree that Cooper [ ] is not the employer of the decedents in the underlying suit," the district court found "as a matter of law that [Cooper] is not the insured under the ACE employer's liability policy in the instant action." In the end, the district court ordered Cooper to pay AISLIC $683,250. On June 19, 2007, Cooper and B-Line filed their notice of appeal.

## II. DISCUSSION

A grant of summary judgment is reviewed de novo, applying the same standard as the district court. Stotter v. Univ. of Tex. at San Antonio, 508 F.3d 812, 820 (5th Cir. 2007). "A party is entitled to summary judgment only if 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Id. (quoting FED. R. CIV. P. 56(c)). The facts are viewed in the light most favorable to the party opposing the summary judgment motion and all reasonable inferences are drawn in that party's favor. Id.

### A. Coverage Under the ACE Employer's Liability Policy

---

This employers liability insurance applies to bodily injury by accident or bodily injury by disease. Bodily injury includes resulting death.

1.     The bodily injury must arise out of and in the course of the injured employee's employment by you.

* * *

B.     We will Pay
We will pay all sums you legally must pay as damages because of bodily injury to your employees, provided the bodily injury is covered by this Employers Liability Insurance.

(Emphasis added).

5

Cooper argues that the district court erred by denying joint coverage to Cooper and B-Line under the ACE employer's liability and the AISLIC excess liability policies for the claims asserted against them in the underlying suit. Cooper maintains that the language in the ACE policy creates a single collective insured—Cooper and its subsidiaries, including B-Line—and that the purpose of this structure is to avoid paying multiple deductibles when the parent company, Cooper, is sued along with one or more of its subsidiaries for liabilities arising out of the same incident. Thus, Cooper posits that after it satisfied the ACE primary policy's $1 million limit, the AISLIC excess policy covers all claims against both Cooper and B-Line, up to the $25 million limit, which would encompass the amount Cooper paid to settle the underlying lawsuit, namely, $683,250.

AISLIC contends that Cooper's liability is not covered by the ACE employer's liability policy because only B-Line, the corporate subsidiary that employed the decedents, is the insured under said policy. Under AISLIC's interpretation, the ACE employer's policy only insures an entity for claims brought by that entity's employees and does not jointly insure all entities for claims by employees of other covered entities. Because the decedents in the underlying suit were employees of B-Line, not Cooper, AISLIC argues that Cooper must rely on its GCL policy to cover the settlement of the claims asserted against it. According to AISLIC, since the settlement amount attributable to Cooper is $1.35 million, which is less than the $5 million deductible under Cooper's GCL policy, AISLIC is not obligated to indemnify Cooper. Rather, Cooper must reimburse AISLIC the amount it paid on behalf of Cooper.

In diversity cases, such as this one, federal courts look to the substantive law of the forum state. Texas Indus., Inc. v. Factory Mut. Ins. Co., 486 F.3d 844, 846 (5th Cir. 2007). Under Texas law, insurance policies are governed by the same rules of construction that apply to contracts generally. Valmont Energy

Steel, Inc. v. Commercial Union Ins. Co., 359 F.3d 770, 773 (5th Cir. 2004); Balandran v. Safeco Ins. Co. of Am., 972 S.W.2d 738, 740–41 (Tex. 1998). The primary goal is to give effect to the written expression of the parties' intent. Id. at 741. "The terms used in an insurance policy are to be given their ordinary and generally accepted meaning, unless the policy shows that the words were meant in a technical or different sense." Canutillo Indep. Sch. Dist. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 99 F.3d 695, 700 (5th Cir. 1996) (citing Sec. Mut. Cas. Co. v. Johnson, 584 S.W.2d 703, 704 (Tex. 1979)). The policy should be considered as a whole so as to give effect and meaning to each part. Id.; Valmont Energy Steel, Inc., 359 F.3d at 773; see also Balandran, 972 S.W.2d at 741 ("We must read all parts of the contract together, . . . striving to give meaning to every sentence, clause, and word to avoid rendering any portion inoperative.").

"Texas contract interpretation law indicates that '[i]f policy language is worded so that it can be given a definite or certain legal meaning, it is not ambiguous and we construe it as a matter of law.'" Texas Indus., Inc., 486 F.3d at 846 (quoting Am. Mfrs. Mut. Ins. Co. v. Schaefer, 124 S.W.3d 154, 157 (Tex. 2003)). Whether a contract is ambiguous is a question of law for the court to decide. Id. "The fact that the parties offer different contract interpretations does not create an ambiguity." Id. An ambiguity exists only if the contract language is susceptible to more than one reasonable interpretation. Id.; Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus., Inc., 907 S.W.2d 517, 520 (Tex. 1995). "[I]f a contract of insurance is susceptible of more than one reasonable interpretation, we must resolve the uncertainty by adopting the construction that most favors the insured." Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Hudson Energy Co., 811 S.W.2d 552, 555 (Tex. 1991).

As support for its argument that the ACE policy establishes joint coverage, Cooper points to the fact that the policy lists one "Named Insured," Cooper

Industries, Inc. (the predecessor to Cooper), and then contains a unique "Extension of Named Insured" endorsement that lists all other Cooper entities, including B-Line, as additional workplaces. According to Cooper, this endorsement creates coverage for the Cooper group of companies as a single, collective insured for claims brought by employees of the Cooper group. Cooper highlights specific provisions and language in the ACE policy that purportedly require this construction. In particular, the ACE policy: (1) uses the word "extension," to broaden who is to be considered the Named Insured rather than to add additional separate insureds; (2) explicitly refers to the subsidiaries as Cooper's "other workplaces," rather than additional corporate entities, additional employers, or additional named insureds; (3) contains no separation of interests clause distinguishing Cooper's subsidiaries from Cooper; and (4) defines "you" as "the employer named in Item 1 of the Information Page," i.e., Cooper, and then uses the words "you" and "your" to refer to the insured when describing covered claims throughout the policy. In addition, Cooper argues that case-law supports its single collective insured construction. And, although Cooper admits that it was not the decedents' common law employer, Cooper contends that the lack of an employment relationship has no bearing on the issue whether the Extension of Named Insured endorsement reasonably creates a single insured entity.

According to AISLIC, Cooper misconstrues the Extension of Named Insured endorsement to argue that it "extends" coverage to any Cooper entity for claims by any other entities' employees. AISLIC argues that Cooper's interpretation is nonsensical and contrary to the unambiguous policy language. For example, AISLIC points out that under Cooper's interpretation, Cooper Power Tools, Inc. would be covered for claims by Cooper Bussman, Inc.'s employees, since both subsidiaries are listed in the Extension of Named Insured endorsement. AISLIC submits, therefore, that the only reasonable interpretation is that the Extension of Named Insured endorsement merely adds

various Cooper entities as named insureds to the policy for claims brought against each Cooper entity by its own employees.

Before conducting our review, we note that because Cooper admits that it was not the decedents' employer, the only issue is whether the policy language either unambiguously or reasonably creates a single collective insured, so that an employee of any of the covered entities is considered an employee of the single collective insured under the ACE policy. For the following reasons, we agree with the district court's determination that the ACE employer's policy does not support a single insured construction.

To begin, the policy is defined in the General Section as a contract of insurance between the insurer and "you (the employer named in Item 1 of the Information Page)." (Emphasis added). The General Section further states that "you are insured if you are an employer named in Item 1 of the Information Page." (Emphasis added). Thus, in order to answer the question whether the policy covers a single collective insured, we must determine which entities are employers under Item 1.

Item 1 lists the Named Insured as Cooper and provides the corporation's mailing address. Item 1 further states that "[o]ther workplaces not shown above" are located in the "Extension of Named Insured." As the district court noted, because the phrase "other workplaces not shown above" is what references the Extension of Named Insured endorsement, the word "Extension" in that provision may reasonably refer to workplace locations, which includes locations in thirty-five states, rather than additional corporate entities. Based on that construction, Cooper and its listed workplace locations would be one insured employer under Item 1, but its listed subsidiaries would be separate employers under Item 1 and thus separate insureds under the ACE policy.

The General Section of the policy supports this interpretation by distinguishing workplaces from employers. Under subsection B "Who is

9

Insured," the policy states "you are insured if you are an employer named in Item 1 of the information page." (Emphasis added). Then, under subsection E "Locations," the policy provides coverage to "all of your workplaces listed in Items 1 or 4 of the Information Page." (Emphasis added). These provisions reveal that the designations of "employer" and "workplace" are mutually exclusive, that workplaces are a subset of an employer, and that Item 1 of the information page, the Named Insured section, will list them both. The question then becomes whether Cooper's named subsidiaries are considered employers or workplaces of Cooper. If they are employers, they are separate insureds under the policy. However, if they are workplaces, they are a subset of Cooper, which would support the theory of a single collective insured.

The Named Insured's reference to "other workplaces not shown above" offers guidance. Taken in context, the word "other" seems to indicate that under Item 1 on the information page, at least one workplace is shown. See AMERICAN HERITAGE DICTIONARY 880 (2d ed. 1982) (defining other as "[b]eing or designating the remaining ones of several") (emphasis added). Since Cooper is the only entity listed on that Information Page, and we know that it is an insured employer, "other workplace" must refer to the location, or address, provided for Cooper. Thus, Cooper's other listed addresses in the Extension of Named Insured endorsement would be Cooper's other workplaces. However, the subsequent list of legal entities, or subsidiaries, need not be classified as Cooper's workplaces, since their listings are not simply enumerated addresses of Cooper. Instead, those legal entities are more appropriately considered employers because they, like Cooper, are also capable of having a number of workplace addresses.[6] Thus, contrary to Cooper's theory of coverage, a

---

[6] For example, the following subsidiaries have more than one workplace location listed in the ACE policy: Cooper B-Line, Cooper Bussman, Cooper Lighting, and Cooper Wiring Devices.

10

reasonable construction borne out by the policy language is that the subsidiaries are employers, like Cooper, and not merely workplaces, or extensions, of Cooper.

Moreover, although Cooper relies on the distinction between the meanings of the words "extension" and "addition" to bolster its single insured theory,[7] the policy's use of "extension" is also reconcilable with a separate insured construction. The word Extension is used in the phrase "Extension of Named Insured" and each page of the Extension is entitled "ITEM 1 OF THE INFORMATION PAGE IS EXTENDED AS FOLLOWS." Notably, "extension" in both those phrases refers to the heading from the information page, i.e., "Item 1. Named Insured," and not to the employer listed under "Item 1. Named Insured" on the information page, which would be Cooper. Thus, considering that the "Item 1. Named Insured" section on the information page only provides enough space to include one employer and its mailing address, the Extension was likely incorporated to extend that section and provide space for a complete list of employers to be included as Named Insureds under the policy. This interpretation accords with one of Cooper's suggested definitions of the word "extend," as "to cause to be of greater area or volume." (Emphasis added). Consequently, the "Extension of Named Insured" endorsement does not necessarily support Cooper's argument that Cooper is the single insured under the policy and its subsidiaries are mere extensions of it.

Additionally, at least two provisions of the policy indicate that there is more than one insured covered. First, in the general section, it states, "You are insured if you are an employer named in Item 1 of the Information Page."

---

[7] Cooper informs the court that the dictionary definition of "extension" is "the act of extending; state of being extended; an enlargement in scope or operation," and that the definition of "extend" is "to spread or stretch forth . . . to stretch out to fullest length . . . to cause to be of greater area or volume . . . to increase the scope, meaning, or application of." Thus, Cooper contends that the words "extension" and "extend" refer to "the broadening of an item rather than the addition of a separate item." (Emphasis added).

(Emphasis added). The words "an employer" signify that there is more than one employer listed in that section. Second, in "Part Six—Conditions," the policy explains that the "Sole Representative" is "[t]he insured first named in Item 1 of the Information Page [who] will act on behalf of all insureds to change the policy, receive return premium, and give or receive notice of cancellation." (Emphasis added).

In short, by reading its provisions in context and giving effect to all parts, the ACE employer's policy is reasonably interpreted as treating Cooper's subsidiaries as separate additional insureds. Therefore, we next consider whether the separate additional insured theory is the only reasonable interpretation of the policy language or whether Cooper's single insured theory is also reasonable, thereby creating an ambiguity in the ACE policy.

Cooper cites Blue Diamond Coal Co. v. Holland-American Insurance Co. as support for the reasonableness of its single insured construction. 671 S.W.2d 829 (Tenn. 1984). The Supreme Court of Tennessee determined in Blue Diamond that, under the insurance policies issued to the parent company in that case, it would be reasonable to infer that the parties intended to treat the parent company and its two subsidiary corporations as one insured entity indemnified against liability to employees of any one of its three companies. Id. at 834. The court noted that the insurance policies' use of the word "employer" in the phrase limiting liability coverage to an "employee in the immediate service of the employer" created a latent ambiguity in the policy because of the "ambiguous state of extrinsic circumstances" to which that word referred. Id. at 833. These extrinsic circumstances included that the parent company functioned as a mere holding company for its two subsidiaries, that the parent company and its two subsidiaries had identical directors and officers, and that the named insured in the policy listed all three entities joined by the words "and/or." Id. at 830–33. The Blue Diamond court concluded that the policy could reasonably be read to

insure all three companies as a single entity or that it could be interpreted as extending coverage only to the corporate entity whose employees were injured in its immediate service. Id. at 834. Consequently, that court reversed and remanded the case to the trial court, stating that it was "not a proper case for disposition on motions for summary judgment." Id. at 835.

Although Cooper's theory of coverage is the same as that in Blue Diamond, namely, that the parties intended to create a single insured entity composed of the parent company and its subsidiaries, Blue Diamond's "ambiguous state of extrinsic circumstances" is not present in Cooper's case. First, Cooper does not maintain that its parent companies and subsidiaries all have the same officers and directors. Second, Cooper has not alleged that it is merely a holding company for all of its subsidiaries. Third, the Named Insured section in the ACE policy lists Cooper and its subsidiaries separately, rather than connected by the phrase "and/or." Fourth and most significantly, Cooper has six times as many subsidiaries listed in its insurance policy as the parent company had in Blue Diamond. As such, it is far less reasonable to infer that the parties in the case at bar intended to cover a total of thirteen separate legal entities, five of which have more than one workplace, as a single insured, without ever saying so explicitly. Thus, Cooper's case does not accord with Blue Diamond and the reasoning of the Tennessee Supreme Court.

Cooper also relies on Texas automobile insurance cases to argue that the absence of a severability clause in the ACE policy is consistent with a collective insured construction. However, these cases are sufficiently dissimilar and would not be controlling in Cooper's case. Specifically, the Texas cases consider whether a provision that excludes coverage for claims by the insured's employees would also exclude coverage for claims by the insured's employees against the non-employer omnibus insured. In the earliest cited case, American Fidelity & Casualty Co. v. St. Paul-Mercury Indemnity, this court determined that, absent

a severability of interests clause, the employee exclusion applied not only to the named insured, but also to the omnibus insured, thereby excluding coverage under the policy. 248 F.2d 509, 516–18 (5th Cir. 1957). Significantly, though, in St. Paul-Mercury, this court noted the difference between automobile insurance, or public liability coverage, and employer's liability coverage, stating that "[t]he two present different hazards of frequency and severity and traditionally are underwritten separately." Id. at 516 (emphasis added). Thus, cases considering the effect of exclusionary provisions under automobile policies are poor precedent for cases, like Cooper's, considering coverage provisions under employer's liability policies.[8]

Moreover, there are persuasive employer liability cases from other states considering the effect of the same employer coverage language on multiple insureds. For example, in Kenosha Beef International v. North River Insurance Co., the Court of Appeals of Wisconsin held that the parent and subsidiary companies were separate insureds and liability under the employer's liability policy could not be premised upon an employee of one insured suing another insured. 445 N.W.2d 703, 706 (Wis. Ct. App. 1984). In that case, the policy listed, as insureds, the parent company and two wholly-owned subsidiaries of the parent. Id. at 705. First, the court determined that the plain language of

---

[8] However, even if those automobile insurance cases were controlling, the reasoning in the later cases, such as Float-Away Door Co. v. Continental Casualty Co., 372 F.2d 701, 708 (5th Cir. 1966), would not support Cooper's theory. In Float-Away Door, this court determined that an employee exclusion in an automobile policy lacking a severability clause would not apply to all insureds collectively. Id. at 708–09. In making that determination, this court stated: "The better reasoned cases adopt a restrictive interpretation of the insured as referring only to the party seeking coverage under the policy." Id. at 708 (emphasis added and citations omitted); see also Commercial Standard Ins. Co. v. Am. Gen. Ins., 455 S.W.2d 720, 720 (Tex. 1970) (stating that even before the addition of the severability of interests provision, "there was substantial authority in support of the construction that the rights of each insured under the policy are to be determined as if there were no other person protected thereby"). Consequently, even in the absence of a severability clause, the restrictive reading approach from Float-Away Door would suggest that this court treat each "insured" in the ACE employer's policy separately from the other insureds under the policy.

the policy recognized that the companies were separate insureds, citing, in particular, the following provision from that policy:

> The insured first named in item 1 of the Information Page will act on behalf of all insureds to change this policy . . . .

Id. Second, the Kenosha Beef case discussed the applicable policy language, which covered damages because of bodily injury to "your employee that arises out of and in the course of employment, claimed against you . . . ." Id. at 704–05. Because the parent company's construction permitting claims by an employee of one insured against another insured would have interpreted the pronouns "you" and "your" in that provision to have different meanings in different places within the same paragraph, without a change in antecedent, the court determined the parent company's construction was unreasonable. Id. at 705. That case concluded with this statement:

> We reiterate that this policy is one for worker's compensation and employers' liability only. Because [the parent company] was not [the injured plaintiff's] employer, coverage was more appropriately provided through its comprehensive general liability carrier, . . . including [the parent corporation's] retained limit . . . under that policy.

Id. at 706.

The Cooper case is strikingly similar to Kenosha Beef. Both policies include worker's compensation and employer's liability coverage. The same coverage language is at issue. And the employer's policy in this case contains the identical provision that was cited in Kenosha Beef for its plain recognition of separate additional insureds under the policy there. Thus, although the Kenosha Beef case did not deal with an Extension of Named Insured endorsement, the facts are sufficiently similar to be persuasive precedent for this

court. See also *Producers Dairy Delivery Co., Inc. v. Sentry Ins. Co.*, 718 P.2d 920, 922, 925–26 (Cal. 1986) (holding that an employer's liability policy that covered the insured and a closely related corporation and that indemnified for damages sustained "by an employee of the insured arising out of and in the course of his employment" did not extend coverage to the insured for an injury suffered by the employee of the closely related corporation).

Furthermore, as the district court noted in its order, it is well-established under Texas law that, absent exceptional circumstances, parent and subsidiary corporations are recognized separate entities. *Valero S. Tex. Processing Co. v. Starr County Appraisal Dist.*, 954 S.W.2d 863, 866 (Tex. App.—San Antonio 1997, pet. denied) ("In Texas, for the purposes of legal proceedings, subsidiary corporations and parent corporations are separate and distinct 'persons' as a matter of law; the separate entity of corporations will be observed by the courts even in instances where one may dominate or control, or may even treat it as a mere department, instrumentality, or agency of the other."); *see also Sims v. W. Waste Indus.*, 918 S.W.2d 682, 684 (Tex. App.—Beaumont 1996, writ denied) (finding Texas law does not allow a parent corporation to assert Worker's Compensation immunity through its subsidiary's immunity by means of reverse piercing because the parent and corporation are separate legal entities). Accordingly, we agree with the district court that Cooper's single collective insured construction is unreasonable—the plain language of the ACE employer's policy only covers the claims of the decedents' representatives against the decedents' employer B-Line, not B-Line's parent company, Cooper.

### B. Allocation of the Settlement

Alternatively, Cooper argues that even if the ACE employer's policy only covers B-Line's exposure, the district court still erred by failing to address the issue of allocation and granting AISLIC summary judgment for the full amount that it paid allegedly on behalf of Cooper. According to Cooper, although the

16

parties each agreed to pay half of the disputed $1.35 million in order to settle the underlying case, Cooper never agreed that this amount should be attributed to Cooper as opposed to B-Line. Instead, Cooper submits that AISLIC unilaterally allocated the entire $1.35 million to Cooper's potential liability. Thus, Cooper contends that a genuine issue of material fact exists precluding summary judgment on this issue. In response, AISLIC asserts that the district court did not review the allocation of the $1.35 million from the underlying settlement because: (1) Cooper did not affirmatively request a judicial determination of the allocation in its pleadings; and (2) the proper allocation was already established by the parties' letter agreement.

We find that Cooper's complaint sufficiently raised the issue of allocation. "The notice pleading requirements of Federal Rule of Civil Procedure 8 and case law do not require an inordinate amount of detail or precision." St. Paul Mercury Ins. Co. v. Williamson, 224 F.3d 425, 434 (5th Cir. 2000); see FED. R. CIV. P. 8 ("A pleading . . . must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief . . . ."). "The function of a complaint is to give the defendant fair notice of the plaintiff's claim and the grounds upon which the plaintiff relies." Id. (citing Doss v. S. Cent. Bell Tel. Co., 834 F.2d 421, 424 (5th Cir. 1987)). And the "form of the complaint is not significant if it alleges facts upon which relief can be granted, even if it fails to categorize correctly the legal theory giving rise to the claim." Id. (quoting Dussouy v. Gulf Coast Inv. Corp., 660 F.2d 594, 604 (5th Cir. 1981)).

Here, the standard was satisfied because in Texas the segregation of insurance settlement amounts between covered and uncovered claims is based on the doctrine of concurrent causes. Comsys Info. Tech. Servs., Inc. v. Twin, 130 S.W.3d 181, 198 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). Under that doctrine, when covered and non-covered perils combine to create a loss, the insured is entitled to recover that portion of the damage caused solely by the

covered peril. Id. Significantly, the doctrine "embod[ies] the basic principle that insureds are not entitled to recover under their insurance policies unless they prove their damage is covered by the policy." Id. Thus, the allocation of an insurance settlement between covered and non-covered claims coincides with the insured's burden to prove coverage under the policy and damages from the insurer's breach of that policy and is not a separate theory of recovery that must be affirmatively pled. Cf. id. ("The doctrine of concurrent causation is not an affirmative defense or an avoidance issue."). Therefore, Cooper's complaint sufficiently raised the issue of allocation by seeking damages from AISLIC for allegedly breaching its insurance policy with B-Line, the covered entity, and Cooper, the (potentially) uncovered entity, when AISLIC refused to pay the total difference between the underlying settlement amount and the agreed upon $1 million deductible.[9]

Moreover, we note, Cooper argued in its briefs to the district court, on at least two separate occasions, that the allocation of liability and settlement amounts between Cooper and B-Line is a disputed issue of material fact, precluding summary judgment. See Vogel v. Veneman, 276 F.3d 729, 733 (5th Cir. 2002) ("Except in cases of extraordinary circumstances, we do not consider issues raised for the first time on appeal. A party must have raised an argument to such a degree that the trial court may rule on it.") (internal citations and quotations omitted). Consequently, the issue of allocation was adequately raised, and we may consider it on appeal.

---

[9] Furthermore, we note that AISLIC had fair notice from the beginning of the suit through the discovery period that Cooper disagreed with the allocation of the settlement between Cooper and B-Line. In particular, Cooper's complaint twice stated that AISLIC only paid the portion of the settlement that it, alone, attributed to B-Line's liability exposure. A further review of the record also reveals that many of Cooper's discovery requests centered on AISLIC's apportionment of the settlement. And, finally, AISLIC, in its own counterclaim, admitted to paying the settlement amount that it, not Cooper, attributed to B-Line's liability exposure.

Nor are we persuaded that the district court did not address apportionment because Cooper had agreed with attributing $1.35 million of the settlement to its potential liability in the parties' letter agreement. We first note that the district court could not have relied on the letter agreement in granting summary judgment to AISLIC because AISLIC neither mentioned it in any of its summary judgment briefs, nor otherwise included it as part of its summary judgment evidence. Additionally, Cooper never consented to AISLIC's allocation of liability in that letter. Instead, Cooper only agreed to pay the $1 million deductible under the ACE employer's liability policy. Beyond that, the letter explicitly states that there "remains a dispute" and that Cooper "reserve[s] all of [its] rights and nothing in this agreement shall constitute an admission against interest." And while the letter provides that "Cooper and AIGDC [the parent company of AISLIC] will each fund approximately $700,000 above the undisputed $3.6 million," it does not state that one party may recover only the exact amount it paid, but that each party may recover an amount "up to $700,000." (Emphasis added). Thus, the letter reveals that the parties clearly contemplated the possibility of a lesser recovery. In short, Cooper reserved its right to argue that an allocation of the disputed settlement amount—$1.35 million—is required.

Nonetheless, in the context of summary judgment, "where the non-movant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." Lindsey v. Sears Roebuck & Co., 16 F.3d 616, 618 (5th Cir. 1994). In this case, although the insurer, AISLIC, counterclaimed seeking reimbursement for the amount it attributed to and paid on behalf of Cooper's alleged liability exposure, AISLIC does not bear the burden of proving the proper allocation of damages between the covered entity, B-Line, and the uncovered

entity, Cooper, in order to recover. In an insurance coverage dispute, the insureds, Cooper and B-Line, bear that burden. See Winn v. Cont'l Cas. Co., 494 S.W.2d 601, 606 (Tex. App.—Tyler 1973, no writ) ("The burden of apportioning damages between coverage and non-coverage is on the insured."). Thus, when AISLIC asserted in its motion for summary judgment that the allocation of $1.35 million to Cooper's liability was undisputed by the parties, Cooper was required to provide some evidence that this allocation was in fact disputed, and that the portion of settlement damages attributable to Cooper is less than $1.35 million, or alternatively, that B-Line's liability exposure exceeds the undisputed $3.6 million already apportioned to it.

In Cooper's response to AISLIC's motion for summary judgment, Cooper presented the district court with the declaration of Ryan Chadwick, a senior litigation counsel member for Cooper, who negotiated the agreement with AISLIC and allegedly has first-hand knowledge of the parties' agreement.[10] Chadwick stated:

> Cooper never agreed with either the underlying plaintiffs or with AISLIC as to the allocation between Cooper Industries and [ ] B-Line regarding the amounts paid to settle the underlying case. In fact, Cooper believed that most, if not all, of the liability in the case was [ ] B-Line's and that [ ] B-Line's potential exposure was $5.1 million. Cooper believed that Cooper Industries had little, if any, real liability exposure but entered the settlement because of the prospect of continued, protracted and unpredictable litigation.

(Emphasis added). Cooper also included as summary judgment evidence the Third Amended Petition from the underlying suit, which was the live pleading before settlement. That petition set forth the various allegations asserted

---

[10] In the district court, AISLIC moved to strike Chadwick's declaration as improper summary judgment evidence. Because the district court did not rely on the declaration, it declared the issue moot. AISLIC has refrained from making the same argument on appeal.

against Cooper and B-Line, as well as all facts and grounds in support of those claims. Viewing the evidence in the light most favorable to the non-movant Cooper, we conclude that a genuine fact issue exists as to the proper allocation. See Enserch Corp. v. Shand Morahan & Co., Inc., 952 F.2d 1485, 1494 (5th Cir. 1992) (explaining that there were several possible sources available in allocating claimant's damages such as the allegations contained in the complaint in the underlying lawsuit, the facts that would have been the subject of the lawsuit had it been tried, and the settlement itself). As such, we reverse the summary judgment with respect to damages, namely, the district court's order that Cooper pay AISLIC $683,250, and remand so that the district court can properly allocate the $1.35 million settlement amount between B-Line and Cooper.

On remand, if the district court can "apportion damages solely by applying the terms of the settlement, then the decision would be one of law, not requiring a jury."[11] Id. at 1495 (emphasis in original). Or, if the "allegations alone could sufficiently justify an allocation of damages. . . . the [district court can] compare the insurance contract with the complaint and determine as a matter of law what portion of the damages were covered." Id. at 1494.

> [But] [i]f the apportionment cannot be made as a matter of legal interpretation of either the allegations in the complaint or the settlement agreement itself, then the trial court will have to call a jury to allocate damages through the most limited trial it considers necessary . . . . The jury can consider any facts that could have been considered in the underlying lawsuit itself. The trial court, of course, will have considerable leeway in deciding what facts are truly relevant to the apportionment decision, and can thereby (we hope) prevent a full-blown retrial of the [underlying] law suit.

---

[11] We note that the underlying settlement agreement with the representatives of the decedents was neither found in the record nor provided on appeal.

21

Id. at 1495 (addressing the apportionment of a settlement between covered and uncovered losses under an insurance policy).

## III. CONCLUSION

For the foregoing reasons, we affirm the district court's holding with respect to coverage under the employer's liability policy, but we VACATE the district court's judgment and remand for allocation of liability. Each party shall bear its own costs.